## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| SAMUEL KARIM, | ) | |
| | ) | |
| *Plaintiff*, | ) | 15 C 4803 |
| | ) | |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| MICHAEL LEMKE, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM ORDER AND OPINION

Plaintiff, Samuel Karim, is an inmate at Stateville Correctional Center ("Stateville") in the custody of the Illinois Department of Corrections ("IDOC"). He brings this suit pursuant to 42 U.S.C. § 1983 for alleged deliberate indifference to his constitutional rights. Karim brings claims against Defendants Michael Lemke, Troy Johnson, Tarry Williams, Ricardo Tejeda, Regina Beattie, Royce Brown-Reed, and Quinten Tanner (IDOC Defendants), as well as Dr. Saleh Obaisi. The IDOC Defendants now move for judgment as a matter of law on Karim's claims regarding food and water and shelter. (Dkt. 72, 73.) IDOC Defendants Beattie and Brown-Reed move to be entirely dismissed based on insufficient evidence regarding their personal involvement in Karim's allegations. (*Id.*) Defendant Dr. Obaisi moves for summary judgment on all claims against him. (Dkt. 69.) For the following reasons, Defendants' motions are granted.

## BACKGROUND

*Failure to Respond to Summary Judgment*

Despite numerous extensions, recruited counsel, and consistent hand-holding from the Court, Karim failed to respond to Defendants' Motions. Under Local Rule 56.1(b)(3)(C),

"[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Although district courts may liberally construe the federal and local rules for pro se litigants, even pro se litigants are obligated to follow those rules. *Whitfield v. Snyder*, 263 F. App'x 518, 521 (7th Cir. 2008). Regardless of Karim's failure to respond, the record and the law clearly support summary judgment. Nevertheless, the Court will discuss the years of litigation preceding this opinion.

The Court has gotten to know Karim very well over the past seven years. Karim has filed seven claims in this Court. *See Karim v. Robert Derby*, 10 C 1416 (N.D. Ill. March 1, 2010); *Karim v. Godinez*, 14 C 1318 (N.D. Ill. Feb. 19, 2014); *Karim v. Mitchell*, 14 C 5090 (N.D. Ill. July 16, 2014); *Karim v. Ghosh*, 15 C 408 (N.D. Ill. Jan. 14, 2015); *Karim v. Internal Affairs Division, et al.*, 12 C 6934 (N.D. Ill. Aug. 29, 2012); *Karim, et al. v. Obaisi, et al.,* 16 C 7932 (Aug. 5, 2016). Three of these cases are currently pending. Over the years, the Court has had the opportunity to observe Karim and speak to him often by way of court-ordered teleconferences. He is articulate and has a substantial understanding of the litigation process and how to rely on and use case law to make his arguments. Karim has also had the opportunity to work with counsel; the Court has recruited counsel on each and every one of these civil claims for Karim's benefit.

With regard to the instant case, the Court recruited counsel for Karim on November 5, 2015 and counsel prosecuted the case on behalf of Karim for over a year. (Dkt. 40.) Recruited counsel, Ken Moll's diligent efforts included responding to a motion to dismiss, subpoenaing witnesses, and defending and taking depositions. The Court granted a number of extensions for the completion of discovery in order for Mr. Moll to do his work. Discovery was ordered closed one year ago in September 2016. On January 12, 2017, Defendant Dr. Obaisi filed for summary

judgment and separately, the remaining defendants filed for partial summary judgment. Response to the summary judgment was due February 9, 2017—over nine months ago.

When it came time to respond to Defendants' Motions for Summary Judgment, Karim disagreed with Moll's strategy. Moll made efforts to work through their differences and filed two motions to extend the dispositive motion schedule while he worked with Karim to have a unified approach to the case. (Dkts. 79, 80.) However, when it was clear that Karim and his attorney were at "an impasse and were unable to resolve their dispute as to how the case" should be handled, the Court granted Moll's motion to withdraw on March 6, 2017. (Dkt. 83.)

At the time that the motion to withdraw was granted, the Court made it very clear to Karim that he would need to represent himself going forward and needed to respond to summary judgment. (March 14, 2017 Status Hearing, Dkt. 86.) The Court made many efforts and conducted numerous telephone conferences with Karim to accommodate his requests to prepare his response to summary judgment. (*See* Dkt. 110 at 2.) These requests included hand-delivering to Karim deposition transcripts of depositions that Moll had taken but Moll had deemed irrelevant and therefore had not order the transcripts. The Court ensured that Karim received each and every transcript that he requested in spite of his recruited counsel's determination that they were not helpful to his case. Additionally, the Court delivered to Karim an Amicus Brief filed by Sidley & Austin in the consolidated Division III cases against Cook County Jail which was prepared by a team of litigation attorneys to aid pro se plaintiffs in bringing jail conditions cases. The brief comprises 64 pages outlining case law on various prisoner confinement 1983 cases—a tool no doubt helpful to prisoner litigants in navigating responses to summary judgment motions. *See Cox v. Dart, et al.*, 13 C 5874 (N.D. Ill. Oct. 21, 2016) (Dkt. 182).

The Court has also made contact with the prison library to ensure that Karim had access to the library while preparing his response. Between June 5 and September 28, 2017, Karim has visited the prison library nine times. At Karim's request, the library has printed no less than 6,541 pages of case law and photocopies.

The Court gave a final deadline of September 5, 2017 to file a response; when Karim missed that deadline, the Court provided him with yet another extension to September 21, 2017. Rather than spend time on his opposition brief, Karim has been filing emergency motions for extensions. Karim moved the Court for an emergency extension of time, dated September 14, 2017 and filed on the docket on September 18, 2017. (Dkt. 108.) Karim explained that his mother had died on September 10, 2017. (*Id.*) In addition to the emergency motion, on the same date, Plaintiff filed a Motion for Leave to File an Amended Complaint and attached a 41-page amended complaint. Although he posits that his loss supported a further extension to respond to Summary Judgment, Karim was nevertheless able to handwrite a 41-page complaint during that time. (Dkt. 109.) The Court denied the emergency motion on September 20, 2017 and ordered that the order be hand-delivered to Karim that day because the extended deadline of 9/21/17 remained in place. (Dkt. 110.) The Court verified with Stateville that Karim received the order. (Dkt. 111.)

Most recently, on September 25, 2017, Karim filed a motion for appointment of counsel based on Karim's alleged "mental health issues," "back problems, diabetes, Plaintiff [sic] eye's and blood clots." (Dkt. 112.) Karim also alleges that he takes psychotropic medication and the IDOC has placed roadblocks preventing him from litigating. The Court has had numerous phone conferences discussing Karim's medications and the alleged roadblocks. But despite Karim's representations to the Court, the library records clearly showed that Karim had been given

generous time in the library and access to printing case law and briefing so as to prepare his response. All of this research is beyond the detailed Amicus brief filed by the Sidley & Austin lawyers which contained dozens of case citations to the exact issues in this case. The Court also had discussions with Karim on the record during status conferences about his medication and did not deem any of his medications would hamper his ability to litigate the case that he filed. And further, the Court reminded Karim that he was already given a lawyer in this case and due to his inability to cooperate that lawyer withdrew. At the time, the Court warned Karim that he did not have a right to an attorney in his civil case and that he would not be given another one.

Finally, on September 26, 2017, Karim filed a "Motion for Extension of Time Based on Misunderstanding." (Dkt. 114.) He states that he received the September 20 order on September 21 but that he never received the order stating he had until September 5, 2017 to file a response. But the Court stated in open court to Karim that his response was due on September 5 during the August 16, 2017 status hearing. Karim further claims that, lacking intelligence, when he received the deposition transcripts on September 7, 2017, he need time to "read and understand what as being said." (Dkt. 114 at 2-3.) In the meantime, Karim's letters, emergency motions, and his 41-page amended complaint belie his claims that he lacks intelligence and ability. (*Id.* at 4.)

In spite of all of these efforts, in reviewing each and every page of the record and the relevant case law, the Court deems summary judgment in favor of the Defendants is appropriate. Defendants' statements of undisputed facts are supported by the record. And, Karim's repeated failure to respond to summary judgment results in an admission of Defendants' statements of undisputed material facts. The Court's chosen avenue of deeming these facts admitted is amply supported by case law. In *Pierce v. IDHS*, on the day plaintiff Pierce's response to the motion

for summary judgment was due, his then-counsel asked for an extension of time to file a response. 2009 WL 3416213, *28-29 (7th Cir. Oct. 26, 2009). The district court granted the request, but counsel still did not file the response by the updated deadline. *Id.* Although counsel had 53 days from the day IDHS filed its motion for summary judgment. *Id.* at *30. Even after the plaintiff had been generously given a total of 53 days to respond, plaintiff still failed to do so and therefore the district court was within its discretion to "deem[] IDHS's statement of undisputed facts admitted and then determined whether summary judgment was warranted as a matter of law." *Id.* (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)). Similarly, in *Whitfield v. Snyder*, the court set a deadline for summary judgment and warned the prisoner-plaintiff of the consequences of not responding. 263 Fed.Appx. at 519. Yet the prisoner never responded and instead filed numerous discovery motions and a motion for reconsideration. *Id.* The district court held that the repeated failure to respond to defendants' summary judgment motion constituted an admission of the defendants' material facts. *Id.* at 521. The appellate court considered that plaintiff had over a year to prepare for the case and had received a significant amount of discovery to enable him to respond, "there simply was no reason [the plaintiff] could not have responded[.]" *Id. See also Reales v. Consolidated Rail Corp.*, 84 F.3d 993 (7th Cir. 1996) (District court did not abuse discretion in denying plaintiffs' request for a fourth extension of time to respond to defendant's summary judgment motion and the undisputed facts set forth by defendant entitled defendant to judgment as a matter of law.)

The Court has been even more generous with Karim than the district courts in these cases just discussed. Karim was given over a year to conduct discovery and nearly eight months to respond to summary judgment. And it is not as though Karim was somehow unable to file pleadings during this time. Like the plaintiff in *Whitfield* who focused on discovery and motions

to reconsider rather than responding to summary judgment, here, instead of responding to summary judgment, Karim devoted his time and energy to filing a 41-page amended complaint within days of when his response was due. And where the attorney in *Pierce* had 53 days to respond to the motion for summary judgment, Karim has had 252 days to respond.[1] For those reasons, Defendants' statement of undisputed facts, outlined below and which are all supported by record citations, are deemed admitted.

*IDOC Defendants*

Karim primarily alleges five issues which the IDOC Defendants now move for summary judgment on.

First, Karim was provided with a "non-healthy diet in violation of the law." (IDOC SOF ¶ 2; Compl. at ¶ 14.) Specifically, Karim alleges that the diet was "rich in soy and soy genetically altered and given to him well over the daily recommended allowance." (*Id.* ¶ 3.) During his deposition, Karim admitted that he did not know the daily recommended allowance of soy. (*Id.* ¶ 4.) The IDOC's Master Menus show a minimal presence of soy, if any. (*Id.* ¶ 6; Exhibit D, IDOC 7379-7388.) Second, Karim alleges that throughout 2013 through 2015, he had been served cold meals "every morning." (*Id.* ¶ 8; Dkt. 70-2, Karim Dep. 13:18–20.) Karim testified that "[t]hese cold meals are terrible." (Karim Dep. 14:8–9.) These breakfasts, he further explains, are transported with "toxins, bleach, soap, [and] disinfectant[.]" (*Id.* 18:6–8.)He does not allege that he has experienced any harm as a result of these breakfasts. Third, Karim alleged that Stateville has a history of "supplying inadequate/contaminated water to its employees and inmates[.]" (*Id.*, ¶ 16; Compl. at ¶ 43.) Upon information and belief, Karim alleges that the water includes radium, excessive amounts of microbial contaminants, inorganic

---

[1] Calculated based on Defendants' filing date of January 12, 2017 and the final deadline to respond, September 21, 2017.

contaminants, pesticides, and herbicides. (*Id.* at ¶ 17; Compl. ¶ 46.) However, during the relevant period, Stateville's water was regularly tested by the Illinois Environmental Protection Agency. (*Id.* ¶ 18.) During its regular reviews of Stateville's water, the Illinois EPA consistently found no violation when it tested for the presence of regulated water contaminants. (*Id.* ¶ 19 Exhibit C, at IDOC 2938).

Fourth, Karim alleges that there were problems with the roofing where he was housed. In the kitchen, Karim alleged that there were leaks but couldn't "recall exactly where the leaks were. I mean, I'm not a roof man, so I can't say that." (Karim Dep., 20:5–7.) Specifically, "the roofing in Bravo House is hazardous, where whenever it naturally rains, the roof leaks massively, to the point blockades of buckets and trash cans have to be lined up to attempt to catch this water, where even then puddles of water still accumulate on the main floor of the building." (*Id.* at ¶ 9; Compl. at ¶ 25). Karim admitted that no water leaking from the roof entered his cell. (*Id.* ¶ 11.) Nevertheless, Karim thinks that he "suffered potential harm from the [leaks in the kitchen] based on the [] … mold and the nastiness." (Karim Dep. 20:8–22.) Similarly, Karim testified that the leaks from the roof in his cell affected him because, "[w]ell, it causes mold, the ceiling," and that this further "psychologically [is] messing with me every day." (*Id.* 50:18–24; 51:3–6.)

Fifth, Karim alleged that there was lead in the paint of the various cells he had been housed in at Stateville. (*Id.* at ¶ 12.) He believes that the lead paint had simply been painted over without Stateville making any efforts to neutralize the lead paint. (*Id.*) The basis of this belief, Karim testified, was that "you can see the paint. I mean, I know it's 50 different colors under there." (¶ 13) (citing Karim Deposition, 51:16–20.) When pressed further on the issue, Plaintiff stated, "[w]ell, I don't know possibly for sure. I can't say honest—with certainty that

that's—without getting a test kit, I mean, you know. But for the most part, I know that lead paint over a certain period of time when some of these paints was on these cells, they used lead in the paint." (*Id.* at 51:21–52:5).

*Regina Beattie*

Karim also brings claims against Defendant Regina Beattie, the Pharmacy Technician at Stateville. According to Karim, Beattie, in her capacity as Pharmacy Technician, "repeatedly delayed filling Plaintiff's prescription on a number of occasions." (*Id.* at ¶ 20; Ex. A, at ¶ 77). Karim believes that Beattie is responsible for the delay in his medication refills, "[b]ecause she's pharmacy." (*Id.* at ¶ 21; Dkt. 70-2, Karim Dep., at 94:1–3). Karim recalled a specific time when receipt of his diabetic medication was delayed two or three days. (*Id.* 94:15-18.)[2] However, there is no record evidence that any delay was connected to Beattie. Karim initially testified that he had never personally spoken with Beattie but then stated, "you know, maybe if I got a chance to see her while my meds were ran out, yes, I have said something to her on different occasions." (*Id.* 101:17-18; 102:1–3.) He further testified that he could not recall any specific times he had spoken with her. (*Id.* 102:5–12.)

*Royce Brown-Reed*

Karim also sues Royce Brown-Reed based on the fact that she "is the health care administrator," which Karim therefore states makes her "responsible for the work orders and things in conjunction with the warden of operation for the facility[.]" (IDOC SOF ¶ 27; Karim Dep. 111:1–19.) Karim had written Brown-Reed about the cold in his cell and further alleges that his grievances would have been sent up to her. (*Id.*) Brown-Reed was Stateville's Healthcare Unit Administrator between 2013 and 2015. (*Id.* ¶ 28.) She had oversight

---

[2] However, Karim further testified that he received an insulin shot from the "diabetes line" he waited in when his medication was delayed. (Karim Deposition, 93:9-12.)

responsibilities regarding inmate access to medical care. (*Id.* ¶ 29.) She did not, however, have any responsibility to maintain the safety and security of the prison grounds or facilities, to respond to prisoner complaints regarding maintenance, or to create work orders. (*Id.* ¶ 30.) She also was not involved in facility maintenance or repairs. (*Id.* ¶ 31.) Rather, she worked on the administrative side within the Healthcare Unit to monitor offender access to medical care. (*Id.* ¶ 33.)

*Dr. Obaisi*

Karim also brings claims against Dr. Obaisi for delays and denial of medical treatment relating to his collapsed lungs, back pain, gallstones, and Dr. Obaisi's alleged failure to provide a diabetic diet.

Dr. Obaisi testified that a patient with symptomatic gallstones would present with symptoms of abdominal pain mostly in the right upper quadrant. (Obaisi SOF ¶ 18.) Karim, however, never complained of pain in the upper right quadrant but had pain in the epigastric area. (*Id.* ¶ 18.) Even if a physician diagnoses a patient with gallstones, an operation is not performed on asymptomatic gallstones. (*Id.* ¶ 20.) That patient has to be significantly symptomatic to justify the risk of surgery. (*Id.*) When Karim's pain persisted, Dr. Obaisi inquired as to whether Karim would be interested in surgery. (Dkt. 70-4, Obaisi Dep. 24:8–15.) As soon as Karim affirmatively responded, Dr. Obaisi requested approval for Karim's surgical evaluation and Karim subsequently had his gallbladder removed. (*Id.*)

There is no evidence that there was a delay in treating Karim's gallstones. On July 21, 2012, Dr. Obaisi also evaluated Karim who complained of low back pain. (Obaisi SOF ¶ 21.) He did not complain of any abdominal pain. (*Id.*) On October 11, 2012, Dr. Obaisi evaluated Karim and again Karim did not complain of abdominal pain. (*Id.* ¶ 22.) Karim also never

complained of abdominal pain when he saw Dr. Obaisi again on January 28, 2013, April 17, 2013, July 3, 2013, and July 17, 2013. (*Id.* ¶¶ 23, 24, 25, 26.) On September 2, 2013, Dr. Obaisi evaluated Karim and Karim indicated that he had Gastroesophageal Reflux Disease (GERD) and occasional nausea and vomiting. (*Id.* ¶ 27.) The assessment was severe GERD and Dr. Obaisi prescribed the medication Bentyl. (Obaisi SOF ¶ 27.) On September 26, 2013, Dr. Obaisi evaluated Karim who indicated that his GERD was no better, so Dr. Obaisi discontinued the medication, Bentyl, and prescribed a different medication, Reglan. (*Id.* ¶ 28.) On November 5, 2013, Dr. Obaisi evaluated Karim regarding Karim's request for renewal of medication for GERD. (*Id.* ¶ 29.) Karim had no acute symptoms during that visit. (*Id.*) On January 23, 2014, Dr. Obaisi evaluated Karim and Karim did not complain of reflux or any abdominal pain. (*Id.* ¶ 30.) On February 15, 2014 and April 1, 2014, a PA evaluated Karim and Karim did not complain of any abdominal pain. (*Id.* ¶¶ 31, 32.)

On August 8, 2014, Dr. Obaisi evaluated Karim and Karim stated that he had a CT scan of his chest on November 17, 2012, which indicated small gallstones. (*Id.* ¶ 33.) At that time, Karim had a mild tender epigastric area, a symptom of gallstones. (*Id.* ¶ 34.) On August 18, 2014, Dr. Obaisi requested approval from Wexford Health Sources, Inc., for an on-site ultrasound for Karim. (*Id.* ¶ 35.) On September 3, 2014, Karim underwent an ultrasound of his abdomen. (*Id.* ¶ 36.) The ultrasound showed that stones were not causing any inflammation of the gallbladder. (*Id.* ¶ 36.)

Next, on November 19, 2014, Dr. Obaisi evaluated Karim who stated that he had heartburn after the recent gallbladder ultrasound and Dr. Obaisi instructed and educated Plaintiff about a low-fat diet. (Obaisi SOF ¶ 39.) On January 10, 2015, a Registered Nurse saw Karim who complained of indigestion and heartburn. (Obaisi SOF ¶ 40.) On January 13, 2015,

Plaintiff was evaluated by Dr. Martija in the asthma clinic and did not complain of abdominal pain during that visit. (Obaisi SOF ¶ 41.)

When Karim's pain relating to the gallstones did not decrease, Dr. Obaisi discussed the possibility of surgery and Karim expressed interest. Dr. Obaisi requested a referral of Plaintiff to general surgery regarding gallstones. (Obaisi SOF ¶ 42.) On May 21, 2015, Plaintiff was approved for a surgical evaluation regarding his gallstones. (*Id.* ¶ 42.) On August 11, 2015, Plaintiff underwent a surgical evaluation of his gallstones at the University of Illinois Hospital & Health Sciences System. (*Id.* ¶ 43.) On August 18, 2015, Dr. Obaisi requested and gained approval for Plaintiff to undergo a gallbladder removal surgery or robotic cholecystectomy and on August 25, 2015, Karim had the surgery at the University of Illinois Hospital & Health Sciences System. (*Id.* ¶¶ 44, 46.)

Karim claims that when he had gallstones, he had pain in the right side of his stomach every time he ate. (Obaisi SOF ¶ 48.) However, he does not know if any other pain was caused by his gallstones. (*Id.* ¶ 49.) Karim also does not know when he began having stomach pains related to his gallstones. (¶ 50.)

Dr. Obaisi testified that many patients live their entire life with gallstones and have no symptoms. (Obaisi SOF ¶ 57.) A physician would not treat an asymptomatic gallstone. (*Id.*) Even if a physician diagnoses a patient with gallstones, an operation is not performed on asymptomatic gallstones. (*Id.*) Non-surgical treatment consists of treating the patient's symptoms. (*Id.*) Dr. Obaisi generally prescribes the medication Bentyl to treat the patient's symptoms. (*Id.*) If the pain goes away and there are no complications then the physician does not recommend surgery. (*Id.*) If episodes of abdominal pain, nausea, and vomiting keep coming

back, after gallstones are confirmed on an ultrasound, only then would Dr. Obaisi consider recommending surgery. (*Id.*)

Karim also claims that Dr. Obaisi was indifferent to his needs relating to his diabetes. Karim alleges he was diagnosed with diabetes in August 2014 but was not told until April 2015. (Obaisi SOF ¶ 53.) Karim does not allege any harm relating to this alleged delay. Karim has received some treatment for diabetes. (Obaisi SOF ¶ 53.) When Karim asked to be placed on a diet to help with his diabetes, Dr. Obaisi only told Karim to continue eating his daily meals. (Obaisi SOF ¶ 54.) Karim did not testify regarding any harm caused by failure to receive his diabetes diet. Dr. Obaisi gives the inmates recommendations verbally based on the American Diabetes Association. (Obaisi SOF ¶ 55.) However, Dr. Obaisi also testified that he did not personally treat Karim for diabetes. (Obaisi SOF ¶ 55.) Also, the IDOC does not offer a special diet for diabetes. (Obaisi SOF ¶ 55.)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not

adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.' ").

## DISCUSSION

### I. Defendant Dr. Obaisi's Motion for Summary Judgment

Dr. Obaisi's Motion for Summary Judgment is granted based on (1) the fact that many of the allegations are duplicative of Karim's other civil lawsuits against Obaisi; and (2) the remaining allegations fail to meet the standard of deliberate indifference.

*Duplicative Claims*

This case is one of three pending lawsuits filed by Karim in this Court. *See Karim v. Ghosh et al.,* 15 C 408, (N.D. Ill. 2015) (J. Kendall) ("Ghosh"); *see Karim v. Hardy et al.,* 14 C 1318 (N.D. Ill. 2014) (J. Kendall) ("Hardy"). In *Ghosh,* Karim alleges that he sought medical treatment from Dr. Obaisi related to back pain. (Def. SOF ¶ 5.) Dr. Obaisi's motion for summary judgment is pending in that case and he is represented by counsel. (*Ghosh,* Dkt. 97.) In *Hardy,* Karim alleges that Dr. Obaisi failed to provide him medical treatment resulting in a collapsed lung. (Def. SOF¶ 6.) To the extent that Karim now sues for back pain and a lung collapse, his claims cannot move forward because they are duplicative of claims filed in other lawsuits. *See Palka v. City of Chicago,* 662 F.3d 428, 437 (7th Cir. 2011) ("This case is a quintessential example of claim splitting in duplicative lawsuits, a litigation tactic that res

judicata doctrine is meant to prevent"); *see also Rogers v. Desiderio*, 58 F.3d 299, 300 (7th Cir. 1995) ("Plaintiffs hope that more suits will improve their chances: they seek the better of the outcomes. To discourage the tactic, judges award plaintiffs not the better outcome but the first outcome: whichever suit goes to judgment first is dispositive, and the doctrine of claim preclusion (res judicata) requires the other court to dismiss the litigation. Instead of improving plaintiffs' chances, claim-splitting reduces them.") (citations omitted). Karim will not be permitted to proceed on his claims relating to lung collapse and back pain in this matter.

*Deliberate Indifference*

In order to prevail on an Eighth Amendment claim for deliberate indifference to serious medical needs, an inmate must demonstrate that he suffered from an objectively serious medical condition and that the defendant was deliberately indifferent to a risk of serious harm stemming from that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011.) A serious medical condition is "one that a physician has diagnosed as needing treatment or 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). Deliberate indifference is a mental element that requires "more than negligence or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *see also Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002) (deliberate indifference to a prisoner's safety implies avoidance of a known risk, not merely a foreseeable one). Additionally, a defendant can be held liable under § 1983 only if he was personally involved in the conduct that led to a deprivation of constitutional rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In short, the deliberate indifference standard requires that the

defendant knew about the conduct that deprived the plaintiff of his rights, condoned that conduct, facilitated it, approved of it, or turned a blind eye to it. *Arnett*, 658 F.3d at 757.

Prisoners are entitled to adequate medical care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). But a medical professional will only be held liable under the deliberate indifference standard if she makes a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

First, as to the objective elements of a deliberate indifference claim, Karim does not allege that gallstones or a diabetic diet are serious medical needs nor does he claim any correlation between Dr. Obaisi's treatment of the gallstones and diabetes to any adverse health effects. Asymptomatic gallstones do not require any medical treatment and therefore do not constitute a serious medical need. (Obaisi SOF ¶ 57; Dkt. 70-2, Obaisi Dep., 11:21–24.) Not only are they not a serious medical need, Karim did not display symptoms consistent with gallstones. A patient with symptomatic gallstones has symptoms of abdominal pain mostly in the right upper quadrant. (*Id.* ¶ 18.) In nine of his visits to see Dr. Obaisi and physician's assistants between 2012-2013, Karim did not complain of abdominal pain.[3] (*Id.* ¶ 18.) In August 2014, Karim first told Dr. Obaisi of a CT scan in 2012 that had revealed gallstones. (Obaisi SOF ¶ 33.) Over the course of the following two months, Dr. Obaisi requested approval

---

[3] There were only a few complaints of abdominal complain beginning in September 2013, but those were complaints of acid reflux, not in his upper right abdomen, and there is no evidence demonstrating that this pain was connected to gallstones nor that Dr. Obaisi had any other indication the pain was related. Specifically, in September 2013, Plaintiff indicated that he had acid reflux and the occasional vomiting. Dr. Obaisi evaluated Plaintiff and found he had Gastroesophageal Reflux Disease (GERD). (Obaisi SOF ¶ 27.) Dr. Obaisi prescribed Karim medication for his GERD. (*Id.*). Karim saw Dr. Obaisi again less than a month later and complained that his medication was not working, at which point Dr. Obaisi prescribed new medications. (Obaisi SOF ¶ 28.) In the proceeding visit approximate month later, Karim did not demonstrate any acute symptoms of GERD. (Obaisi SOF ¶ 29.)

from Wexford Health Sources, Inc., for an on-site ultrasound for Karim, Karim underwent the ultrasound, and Dr. Obaisi reviewed the ultrasound and determined that there was no need for immediate treatment.  (Obaisi SOF ¶ 35.)  Dr. Obaisi continued to monitor the pain but only just before determining that surgery was appropriate did Karim tell the doctor that he had epigastric pain.  (Obaisi Dep. 24:8–15.)  As soon as Dr. Obaisi discussed surgery with Karim and Karim expressed that he wanted to proceed, Dr. Obaisi referred Karim for surgery and on August 25, 2015, Karim underwent gallbladder removal surgery.  (*Id*.; Obaisi SOF ¶¶ 42, 44, 46.)  Karim never alleges that there were any adverse consequences relating to the timing of his surgery nor does the timeline in the record indicate that Dr. Obaisi delayed treatment.

While there are no Seventh Circuit cases discussing deliberate indifference specifically for failure to treat gallstones, the District of Columbia Circuit Court denied a motion to dismiss a prisoner's claim for failure to treat his gallstones.  In that case, the prison officials failed to treat the prisoner for 60 days following physician's notification that the prisoner was in need of *immediate hospitalization* for his gallstones.  *Brown v. DC*, 514 F.3d 1279, 1284 (DC Cir. 2008).  None of the facts on this record come close to those allegations in *Brown*.  Karim's gallstones were asymptomatic until just prior to his surgery.  Even with an asymptomatic condition, Karim was offered surgery and received it.  There is no evidence of any delay in his surgery constituting deliberate indifference.

Karim also does not allege that a diabetic diet is a serious medical need or that he experienced any adverse health effects as the result of his diet.  *See, e.g., Robeson v. Squadrito*, 57 F.Supp.2d 642, 649-650 (N.D. IN 1999) (County jail officials' failure to give inmate his hypoglycemic diet was not deliberate indifference to inmate's serious medical needs); *see also, e.g., Cody v. CBM Correctional Food Services*, 250 Fed.Appx. 763, 765 (8th Cir. 2007) (Failure

to provide prisoner with prescribed diet for his hypertension, diabetes, and high cholesterol did not qualify as deliberately indifferent to his serious medical needs in the absence of evidence that food he was served was prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food); *see also, e.g., Swift v. Tweddell, et al.*, 582 F.Supp.2d 437, 450 (W.D. NY 2008) (Jail officials were not deliberately indifferent to plaintiff's serious medical needs on connection with his diet for diabetes when there was no evidence of adverse health effects.). Moreover, Dr. Obaisi does not control a patient's diet; but instead, the Illinois Department of Corrections controls his diet. (Obaisi SOF ¶ 55.) Dr. Obaisi did have discussions with Karim about maintaining a healthy diet. (Obaisi SOF ¶ 39.) Because there is no evidence that Karim's diabetes is putting him at risk or that Dr. Obaisi was somehow deliberately indifferent to that risk and because Dr. Obaisi does not control Karim's diet, Karim's claim against him on the basis of failure to receive the diet is unsupported.

There is no evidence on this record linking Dr. Obaisi to any delays or denials of treatment. Therefore, Dr. Obaisi's Motion for Summary Judgment is granted.

## II.    Defendants Beattie and Brown-Reed's Motion for Summary Judgment

Defendants Beattie and Brown-Reed move for summary judgment because there is insufficient evidence that they were personal involved in any of the alleged violations. "The Constitution does not make public employees strictly, let alone vicariously, liable for injuries that befall their charges.". *Pacelli v. DeVito*, 972 F.2d 871, 875 (7th Cir. 1992). The employee must know of the problem and intend that it continue. *Id.* The doctrine of *respondeat superior* does not apply to actions brought under § 1983. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). Thus, to be held individually liable, a defendant must be "personally responsible for the deprivation of a constitutional right.". *Id.* (internal citation omitted). A plaintiff must

demonstrate personal involvement by showing that defendants knew about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

As to Defendant Beattie, Karim alleges that she is liable for delays in his medical refills. (IDOC SOF ¶ 20.). When Karim was asked during his deposition why he believed that Beattie was responsible for the delay, he stated "[b]ecause she's pharmacy." (IDOC SOF ¶ 21.). However, Karim could not recall any specific interactions with Beattie. (IDOC SOF ¶ 24.). Karim further testified that when he spoke with any officials regarding his medication, his medication was refilled. (IDOC SOF ¶ 26.). Karim only alleges speculation regarding delays in his medication but does not connect Beattie to any action or personal involvement in a delay. Karim seems to rest his allegations on a theory of respondent superior, that if Beattie is "pharmacy" then she is ultimately responsible for the delays. But *respondeat superior* cannot be the basis for liability in Section 1983 litigation. *Sanville*, 266 F.3d at 740.

With respect to Brown-Reed, Karim alleges that she is liable for filthy conditions in his cell house. (IDOC SOF ¶ 27.). However, between 2013 and 2015, Brown-Reed was employed at Stateville as the facility's Healthcare Unit Administrator. (*Id.* at ¶ 28.). In that role, Brown-Reed had oversight responsibilities regarding offenders' access to medical care. (*Id.* at ¶ 29.). She was not responsible for the safety and security of the prison grounds, to respond to prisoner complaints regarding maintenance, or to create work orders. (*Id.* at ¶ 29.). She was not involved in facility maintenance or repairs. (*Id.* at ¶ 31.). Therefore, Karim does not allege nor is there evidence on the record that Brown-Reed was personally involved in the allegedly filthy conditions in the cell house.

There is not enough evidence on the record to connect Beattie or Brown-Reed to the alleged constitutional violations. Their Motion for Summary Judgment is granted.

### III. IDOC Defendants' Partial Motion for Summary Judgment

The IDOC Defendants move for summary judgment on the theory that Karim has not demonstrated the deprivation of a *specific* human need. (Dkt. 73 at 5.) "*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would n to do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis in original). The Seventh Circuit has continued to apply the *Wilson* rule by breaking its decisions down with respect to the discrete human needs at issue. *See, e.g., Smith v. Dart*, 803 F.3d 304, 309–10 (7th Cir. 2015). Breaking down those needs at issue here, Karim alleges that Defendants have violated his right to food and shelter in five ways: (1) he was given cold breakfasts; (2) there was too much soy in his diet; (3) his water supply was contaminated; (4) he was exposed to lead paint; and (5) he was exposed to roof-leaks. Taken either individually or together, these complaints do not rise to a constitutional deprivation.

1. *Cold Breakfasts*

Karim alleges that the cold breakfasts that IDOC served him violated his constitutional rights. Such an allegation does not rise to liability under the Eighth Amendment. It is not serious enough to deprive Karim of any of the measures of civilized society. *See Wilson*, 501 U.S. at 304; *see also Burton*, 2015 WL 5175143, at *2 ("[I]t is true that prisoners cannot expect the amenities, conveniences and services of a good hotel[.]") Further, Karim does not allege that he suffered any harm as the result of the cold breakfasts. In *Jeferson v. Hodge*, the Southern

District of Illinois held that there was "no right to appetizing meals—no right to hot breakfasts." 2013 WL 2284953, at *7 (S.D. Ill. May 22, 2013); *see also Lunsford v. Bennett*, 17 F.3d 1574, 1578 (7th Cir. 1994) (complaint of "cold, poorly prepared beans" did not state Eighth Amendment claim); *see also Pritchett v. Page*, 2002 WL 1838150, at *5 (N.D. Ill. Aug. 12, 2002) ("Cold meal breakfasts instead of hot cereal did not implicate any constitutional rights"). Taking his claim for cold breakfasts on his own, Karim's Eighth Amendment claim fails.

2. *Soy Diet*

Also related to his diet, Karim alleges that an excess of soy in his diet violates his constitutional rights; but he does not actually have knowledge of the daily recommended allowance of soy. Multiple cases in this Circuit have denied similar claims. *See e.g., Riley-El v. Godinez*, 2015 WL 4572322, at *3–4 (N.D. Ill. July 27, 2015) ("the alleged risks posed by consuming a soy-rich diet do not rise to the level of an Eighth Amendment violation"); *see also Stallings v. Hardy*, 2013 WL 5781805, at *9 (N.D. Ill. Oct. 25, 2013) (granting judgment in favor of Warden with respect to claims of excessive soy in offender's diets at Stateville). In *Harris*, the Central District noted that "society today simply does not see soy protein as a risk to the general population, must less a serious risk." *Harris v. Brown*, 2014 WL 4948229, *13–14 (C.D. Ill. Sept. 30, 2014) (rejecting claim that diet excessively high in soy threatened prisoner's health).

At his deposition, Karim testified that he believed he was over the daily recommended allowance based on the fact that he eats soy at three meals per day. (IDOC SOF ¶ 3.) Defendants attach to their Motion for Summary Judgment the "Master Menu" for IDOC which indicate that prisoners receive a variety of foods, from steamed rice to glazed carrots to pinto

beans. (*Id.* ¶ 7.) Karim's complaints of too much soy are not supported by the record and do not rise to a constitutional violation.

### 3. *Water Supply*

Next, Karim alleges that the water in Stateville is contaminated. *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001). But courts in this Circuit have consistently held that the evidence sufficiently demonstrates that water at Stateville does not violate offenders' Eighth Amendment rights. *Riley El v. Godinez*, 2016 WL 4505038, at *9 (N.D. Ill. Aug. 29, 2016); *Allen v. Hardy*, 2012 WL 5363415, at *8 (N.D. Ill. Oct. 26, 2012); *Mejia v. McCann*, 2010 WL 5149273 at *9 (N.D. Ill. Dec. 10, 2010). In *Caroll*, the court affirmed summary judgment for Defendants on the basis that the evidence showed that the contamination levels then present in Stateville's water did not violate EPA standards and would not have required Defendants to take remedial action had they been detected outside a prison. *Id.* at 472-473. While intentionally supplying inmates with contaminated water may rise to cruel and unusual punishment, "failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not." *Id.* at 742. "The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Id.*

There is no evidence that the water at Stateville during 2013 to 2015 contained contaminants that put Karim at risk. Indeed, the Illinois Environmental Protection Agency tested Stateville regularly during that time period. (IDOC SOF ¶¶ 18-19.)

### 4. *Lead Paint*

Karim also alleges constitutional violations based on the lead paint in his cells at Stateville. (IDOC SOF ¶ 12.) Karim specifically alleges that the various cells he has lived in had layers of 30-35 years of old paint with lead in them and that "[e]very so often, the lead paint

is just painted over without neutralizing the lead paint substances in the old lead paint." (*Id.* at ¶ 12.) Karim's only evidence is his testimony that there is lead in the paint "[b]ecause you can see the paint. I mean, I know it's 50 different colors under there." (*Id.* ¶ 13.) Even if Karim had set forth supporting evidence demonstrating lead in the paint, several district courts have held that an undercoating of lead paint does not trigger Eighth Amendment protection. *See, e.g., Mejia*, 2010 WL 5149273, at *8-9; *see also Sanchez v. McCann*, 2010 WL 1408917, at *3 (N.D. Ill. Apr. 2, 2010); *Walker v. Dart*, 2010 WL 669448, at *3 (N.D. Ill. Feb. 19, 2010); *see also Lyons v. Vergara*, 2016 WL 4493455, at *10 (N.D. Ill. Aug. 26, 2016) ("Plaintiff has no right to a freshly-painted cell.") (internal citations omitted).

There also is no evidence of any injury connected to the alleged lead paint. The basic tort-law rule requiring a plaintiff to show that the defendants caused the plaintiff's injuries appl;ies with equal force to deliberate indifference claims under the Eighth Amendment." *Maus v. Murphy*, 29 Fed. Appx. 365, 369 (7th Cir. 2002) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999)). Here, there is no evidence of an injury to Karim.

5. *Roof Leaks*

Finally, Karim alleges that Defendants were deliberately indifferent with respect to the leaking throughout the prison causing mold and hazardous conditions. A prisoner's exposure to mold is not itself sufficiently serious but may be actionable in combination with other unsanitary conditions. For example, in *Townsend*, a plaintiff was forced to sleep on a wet and moldy mattress. *Townsend*, 522 F.3d 765, 768-69, 773 (7th Cir. 2008). But here, Karim testified that his cell was on the second floor of the cell house and that no water leaking from the roof entered his cell. (*Id.* ¶¶ 10-11.)

Additionally, hazardous conditions from the leaks, such as slippery floors, may rise to a constitutional violation but do not do so here. According to Karim, the roofing was hazardous because "whenever it naturally rains, the roof leaks massively, to the point blockades of buckets and trash cans have to be lined up to attempt to catch this water, where even the puddles of water still accumulate on the main floor of the building." (IDOC SOF ¶ 9.) In *Pyles v. Fahim*, an offender brought a claim that the floors of the showers were slippery and therefore hazardous but the allegations in the complaint were not "sufficiently serious to invoke the Eighth Amendment." 771 F.3d 403, 410-411 (7th Cir. 2014). "Federal courts consistently have adopted the view that slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement." *Id.* Conversely, in *Anderson v. Morrison*, there was a question of fact because there was evidence more substantial than the allegations in the *Pyles* pleading. 835 F.3d 681, 682-83 (7th Cir. 2016). Anderson was required to walk down stairs that were "slippery with milk" and "clogged with several days' of accumulated food and rubbish" while the plaintiff was handcuffed. *Id.* "[P]lummeting down a flight of 13 steps presents a far greater risk of physical injury than does slipping on a shower floor." *Id.*

Once again, Karim alleges nothing more than generalized anxiety that such leaks were causing unsanitary conditions but he could not point to any specific harm or risk of harm such as a wet mattress or a flight of stairs daily covered in milk.

*Claims in the Aggregate*

None of the five alleged violations relating to Karim's confinement individually demonstrate an Eighth Amendment claim. But even taking Karim's claims in the aggregate, summary judgment is appropriate. *Wilson* is unequivocal, the aggregate conditions may only rise to the level of an Eighth Amendment violation (when it would not, standing alone) if the

aggregate conditions deprive an offender of a specific human need. *Wilson*, 501 U.S. at 305.

Defendants did not deprive Karim of his fundamental needs for food, drink, or shelter.

<u>**CONCLUSION**</u>

For those reasons, Dr. Obaisi's Motion for Summary Judgment is granted [69], claims against Beattie and Brown-Reed are dismissed [72], and Defendants' Partial Motion for Summary Judgment is granted.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 29, 2017